IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STONEY THOMPSON, | ) | CASE NO. 3:13-CV-529 |
| | ) | |
| Petitioner, | ) | JUDGE HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| ED SHELTON, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2(b)(2). Before the Court is the petition of Stoney Thompson ("Petitioner") for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case of *State of Ohio vs. Stoney Petitioner*, Case No. G-4801-CR-0200703684-00 (Lucas County June 27, 2008) (Doc. No. 6-13 at Ex. 13.) For the reasons set forth below, the petition should be dismissed without prejudice to refiling, and the period of limitations should be tolled while Petitioner promptly exhausts his state court remedies with respect to the new evidence he asserts in support of his claim of actual innocence.

## I. Factual Background

On June 27, 2008, the state trial court convicted Petitioner, after a jury trial, of three counts of complicity in the commission of aggravated murder. *State v. Mobley*, Nos. L-08-1208, L-09-1214, 2011 WL 4529368, *1 (Ohio App. Ct. Sept. 30, 2011). The trial court sentenced Petitioner to a term of life imprisonment without parole on each

count. *Id*. Petitioner's conviction arose out of the deaths of Kenneth Nicholson, Todd Archambeau and Michael York. *Id*. In its decision affirming his conviction and sentence, the state appellate court recited the following relevant facts:

> [Nicholson, Archambeau and York] were murdered at a house located at 410 Ohio Street in Toledo, Ohio. It is undisputed that the killings occurred at 4:10-4:15 a.m. on the morning of October 24, 2006. The evidence at trial did not include any eyewitness testimony to the killings. Two witnesses placed appellant in close proximity to the killings in both time and place.
>
> * * *
>
> At the time of the killings, appellant lived in an apartment at 407 Columbus Street. The apartment is a short distance from the house at 410 Ohio Street. They are separated by a small field.

*Id*. at *2.

## II. Relevant State Procedural History

In December 2007, a Lucas County grand jury issued an indictment charging Petitioner and his brother, Goldy, with three counts of aggravated murder, each with a firearm specification. (Doc. No. 6-2.) The brothers were tried separately. There is no dispute that Goldy, whose trial took place after Petitioner's trial, was acquitted of the murders.

### A. Trial Court Proceedings

At Petitioner's trial, conducted in June 2008, the State offered the testimony of three people who interacted with Petitioner shortly after the time of the murders. John Kuch testified regarding his encounter with Petitioner and Petitioner's brother, Goldy, at approximately 4:00 a.m. on the night of the murders, during which he witnessed

2

Petitioner and his brother run toward their apartment at 407 Columbus Street from the direction of Ohio Street, and watched Petitioner throw a heavy object, wrapped in a paper bag, into the back of a pickup truck. (Trial Transcript ("Tr.") at 1000-1082, Doc. No. 6-8.). According to Kuch, Goldy asked him for a ride to the corner of Erie and Lapier and, while on the way, Goldy told him, "you didn't see me tonight." (*Id*.)

Rosetta Perry, who had frequently visited the apartment where the murders occurred in order to obtain cocaine, also testified that she saw Petitioner near 410 Ohio Street around the time of the killings. (Tr. at 1253-54, Doc. No. 6-9.) According to Perry, she was at 410 Ohio Street on the night of the shootings, and, at some point before the shootings, York stole money and crack cocaine from Petitioner's apartment. *Mobley*, 2011 WL 4529368 at **2-3. Perry left the Ohio Street apartment between 3:00 and 3:30 a.m. and, at the time, saw Petitioner and two other men in the middle of the field that separated Ohio Street and Columbus Street. *Id*.

Kenya Sharp, who was the mother of two of Petitioner's children, testified regarding Petitioner's actions around the time of the shootings. (Tr. 848-952, Doc. No. 6-7.) The state appellate court summarized Sharp's testimony as follows:

> Kenya Sharp testified that appellant left her residence at approximately 10–10:30 p.m. on the night of October 23, 2006, and that she did not have contact with appellant until 6:15 to 6:30 a.m. the following morning. At that time, according to Sharp, appellant telephoned and told Sharp that he ran out of gas and requested that Sharp bring gas to him at the Columbus Street apartment.
>
> Sharp testified that she complied and that when she arrived at the Columbus Street address, appellant loaded two large plastic trash bags into the back seat of her car and told her to take the bags to her Regina Manor apartment. According to Sharp, appellant told her the bags contained dirty laundry.

3

> Sharp testified that she returned to her apartment alone and unloaded the bags. According to Sharp, the bags were heavy and she never looked inside. She returned to the Columbus Street apartment, picked up appellant and their daughters, and returned with them to her apartment.
>
> Sharp testified that later that morning, as she was on the second floor of her apartment getting her older daughter ready for school, she saw Goldy approach her apartment and heard the apartment door open and close. Afterwards the bags were gone.
>
> The state argued at trial that the two bags removed from the Columbus Street apartment on the morning after the murders contained bloody shoes and clothing worn during the killings.

*Petitioner*, 2011 WL 4529368 at **5-6. Sharp also testified that, approximately one week after the murder, she found a bloody sock in Petitioner's washing machine and gave it to Petitioner's mother, who burned the sock. (Tr. 896-97, 950; Doc. No. 6-7.) Sharp also stated that Petitioner told her that he was going to kill her because "there's no witness to no homicide." (*Id.* at 897-98.)

In addition to this testimony, the State offered evidence regarding Petitioner's comments and instructions to other people, arguing that they implicated Petitioner in the murders. For example, Daniel Ruffing, an acquaintance of Petitioner and of the victims, testified that, when he asked Petitioner about the killings, Petitioner "[k]ind of changed subjects and said just that's messed up. Yeah, that's messed up what happened." (Tr. 785-86, Doc. No. 6-7.) William Robasser, who was serving a four-year sentence for robbery at the time of the trial, testified that he had shared a pod at the jail with Petitioner, and that Petitioner told him that Petitioner had taken part in the killings, described the murders and contended that "he didn't believe that [the police] had

4

evidence to convict him." (Tr. 1110-15, Doc. No. 6-8.) Tivita Pierce, the mother of three of Petitioner's children, testified that Petitioner told her to tell police that, on the day of the murders, Kenya Sharp had dropped him off at Pierce's house. (Tr. 809-10, Doc. No. 6-7.) Lynette Avery, a former girlfriend of Goldy, testified that, in July 2007, she had a conversation with Petitioner, during which she asked him whether he had committed the murders, and he responded, "whatever happens I'm not going down by myself." (Tr. 960, Doc. No. 6-7.)

The jury convicted Petitioner of three counts of complicity to commit aggravated murder. (Doc. No. 6-13.) Thereafter, the trial court sentenced Petitioner to three consecutive life terms of imprisonment. (*Id*.)

In August 2008 and March 2009, Petitioner, through counsel, filed motions for a new trial based on newly discovered evidence and a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), respectively. (Doc. Nos. 6-15, 6-17.) In July 2009, the state trial court denied Petitioner's motions for a new trial. (Doc. No. 6-24.)

**B.    Direct Appeal**

In his direct appeal, Petitioner, through counsel, raised 11 assignments of error. In September 2011, the state appellate court affirmed Petitioner's conviction and sentence. *Thompson*, 2011 WL 45293687 at *7. Petitioner filed a notice of appeal and memorandum in support of jurisdiction in the Ohio Supreme Court. (Doc. Nos. 6-37, 6-38.) On February 22, 2012, the Ohio Supreme Court declined jurisdiction and dismissed the appeal. *State v. Thompson*, 961 N.E.2d 1136 (Table), 131 Ohio St.3d 1457 (Ohio 2012). Thereafter, Petitioner filed a motion to reconsider in the Ohio

5

Supreme Court.  (Doc. No. 6-41.)  On April 18, 2012, the Ohio Supreme Court denied the motion.  *State v. Thompson*, 965 N.E.2d 312 (Table), 131 Ohio St.3d 1315 (Ohio 2012).

### III. Proceedings in This Court

On March 11, 2013, Petitioner, through counsel, filed a petition for habeas relief pursuant to 28 U.S.C. § 2254, in which he asserts the following five grounds for relief:

> I. The State of Ohio violated Thompson's right to due process, to confront witnesses against him and to have effective assistance of counsel pursuant to the United States Constitution because it withheld material evidence that was exculpatory.  This was despite repeated requests for discovery.
>
> Supporting Facts: The lead police detective who interviewed informant John Kuch knew Kuch gave numerous prior inconsistent statements (some of which were taped).  The state also knew Kuch was disingen[u]ous when he testified that he was not motivated by a sizeable reward.   Kuch also had multiple prior arrests for providing false information to police.  The lead detective was seated at the prosecution table during trial and did not disclose any of this.  Defense counsel was further deficient because the state needlessly certified all of its key witnesses thereby preventing Thompson from preparing effective cross-examination.  The exculpatory evidence was disclosed during Goldy Thompson's trial – reportedly the violent instigator of the homicides.  Following withering cross-examination of the detective and Kuch, Goldy Thompson was acquitted of all charges.  With no forensics, no confessions and two credible eyewitnesses (including a Block Watch captain) who testified that Stoney Thompson was not one of the two perpetrators observed running from the crime scene, failure to disclose *Brady* material was irreparably prejudicial.  Stoney Thompson has since uncovered additional *Brady* material.

II. The trial court abused its discretion and violated Thompson's right to a fair trial by denying the motion for a new trial. This included Thompson's right to due process, confront witnesses against him and enjoy effective assistance of counsel.

Supporting Facts: It is apparent from the visiting judge's decision that he did not review the voluminous records from . . . Stoney and Goldy Thompson's trials. Each were multiple week jury trials. The perfunctory 1 1/2 page decision was only filed after the appellate court ordered the trial court to act on the motion, which sat for nearly a year. The state could not dispute it violated *Brady*. Both defendants were set to be tried together until very shortly before trial. The separation only occurred because of space limitations. The witnesses against both were nearly identical. The jury's questions and verdict reflected a lack of understanding regarding complicity. The complicity instruction was given without Thompson's prior knowledge or consent. Stoney Thompson was acquitted of aggravated murder and the firearm specifications and was only convicted of complicity. The visiting judge overlooked a lot of issues, and it appears he did not review the entire record including approximately 5,000 pages of transcripts from the [two] trials along with numerous videotaped interviews and exhibits. This is a case over which he did not preside and had no prior knowledge. With no forensics, no direct evidence, no confessions and an inconsistent theory regarding motive, the *Brady* violation was obviously material.

III. Thompson's right to due process and trial by a fair and impartial jury was violated.

Supporting Facts: The jury in this case spent time talking to each other, and other people outside the jury during the entire trial. This included one juror having conversations with a former Lucas County prosecutor. The juror talked during witness testimony and explained that the juror who was friends with the prosecutor took notes for them. They were often permitted to ask questions that were inappropriate. The questions support that they were inattentive

because they were relying upon a juror – who was finally dismissed on the last day of trial – to listen for them. The jury was also very confused by the complicity instruction and returned conflicting verdicts. Finally, the jury did not benefit from observing full and fair cross-examination of the state's witnesses.

IV. Thompson's convictions were legally insufficient and, as such, should be dispatched through judgment of acquittal. The state failed to prove "complicity," "prior calculation and design," and that Thompson acted "purposely."

Supporting Facts: Actions that occur after a crime has been completed cannot create criminal liability for complicity. The only possible evidence the jury could have used to find complicity did not occur until after the murders. Stoney Thompson's girlfriend, who recanetd her testimony stating it was secured under duress, testified that a day or two after the murders, Goldy Thompson came to their apartment with two black trash bags. They were placed in a closet and disappeared shortly thereafter. The state argued Stoney Thompson hid bags containing bloody clothes and shoes. If the jury relied upon this, that would explain the acquittals on the aggravated murder and firearm specification. It would not legally support the convictions for complicity.

V. Thompson's right to due process and a fair trial were violated repeatedly. The state's needless certification of witnesses, untimely production of discovery and likely not producing all *Brady* and discoverable materials resulted in an unfair trial.

Supporting Facts: Stoney Thompson was unable to adequately prepare for cross-examination because the state certified [five] witnesses a few days before trial was set to begin. The state claimed these witnesses could not be disclosed to the defendant because, pursuant to Crim.R. 16(B)(1)(e), these witnesses were subjected to physical harm or coercion. The primary expressed concern was Goldy Thompson. (Of course, with separate trials, Goldy knew of each witnesses' identity well in advance of

8

>  his trial. According to the state, Goldy was the more violent one.) When coupled with the failure to disclose *Brady* material and untimely discovery production, it became nearly impossible for Stoney Thompson to prepare for trial. He did not know there were an additional [five] witnesses and did not have any chance to prepare. Included in these witnesses was John Kuch, the informant about whom *Brady* material was not disclosed.

(Doc. No. 1.) In June 2013, the State filed its Answer/Return of Writ. (Doc. No. 6.) In October 2013, after receiving multiple extensions of time within which to do so, Petitioner filed his Traverse, which was accompanied by a voluminous amount of evidence, some of which was not included in the record before the state courts. (Doc. No. 21.) In November 2013, the State filed a Reply to Petitioner's Traverse. (Doc. No. 29.) Thereafter, on this Court's direction, Petitioner filed a sur-reply in support of his Traverse. (Doc. No. 31.)

## IV. Analysis

In its Answer/Return of Writ, the State argues that Thompson failed to exhaust his fourth ground for relief (sufficiency of the evidence) and the portions of grounds one and five arising out of the state's decision to certify its witnesses, and that these claims are procedurally defaulted. (Doc. No. 6.) The State asserts that Petitioner's third ground for relief (juror inattentiveness) is procedurally defaulted because Petitioner failed to object to the jurors' conduct during his trial. (*Id*.)

In his Traverse, Petitioner contends that he is actually innocent of the offenses of which he was convicted, and, thus, is entitled to habeas relief. (Doc. No. 21 at 52-53.) In support of this argument, he submits, *inter alias*, an affidavit from Kenya Sharp, in

9

which she recants her trial testimony and contends that she testified falsely at trial because Detective Anderson harassed and threatened her with criminal prosecution and separation from her children in order to induce her to provide information that would corroborate his theory that Petitioner committed the murders. (Doc. No. 21-7 at 14-16 (PageID# 3326-28).) Specifically, Sharp states, "I recant my testimony. I did not tell the truth and I really regret it. I tried to at trial, but the prosecutor really went after me. I was really scared by Det. Anderson. I did not want to go to prison for the rest of my life and lose my children." (*Id*. at ¶ 13.)

In it Reply to the Traverse, the State reiterates its argument that several of Petitioner's claims are procedurally defaulted. (Doc. No. 29.) The State also contends that habeas relief is not available on the basis of a freestanding claim of actual innocence. (*Id*.) However, the State concedes that actual innocence may excuse Petitioner's procedural default, and argues that Petitioner's claim may have some merit. (*Id*.) Further, the State notes that Petitioner has not yet presented his actual innocence claim – to the extent that it is based on Sharp's recantation of her testimony – to the state courts. (*Id*.) Accordingly, the State argues that this Court should stay proceedings in this case in order to allow Petitioner to exhaust his claim of actual innocence in state court. (*Id*.)

Thereafter, in response to this Court's order, Petitioner filed a sur-reply brief, in which he argues that, based on the evidence attached to his Traverse, this Court should allow him to return to state court to exhaust his claim of actual innocence and complete the record in this case. (Doc. No. 31.)

10

### A.     Freestanding Claim of Actual Innocence

As an initial matter, Petitioner is incorrect in asserting that § 2254 relief is available for a freestanding claim of actual innocence. In his Traverse and Sur-reply, Petitioner contends that the Supreme Court recognized actual innocence as a basis for habeas relief in *Herrera v. Collins*, 506 U.S. 390, 400 (1993). In *Herrera*, however, the Supreme Court rejected the petitioner's argument that he was entitled to habeas relief based on his claim that he was actually innocent. In that case, the petitioner, Herrera, had been convicted of murder and sentenced to death. He sought § 2254 relief on the basis that he was actually innocent, and supported his petition with affidavits tending to show that his brother had actually committed the crime. Because Herrera had already filed one §2254 petition, the district court, applying the pre-AEDPA standard, dismissed his claims for abuse of the writ, but stayed his execution in order to allow him to present his actual innocence claim to the state courts. The court of appeals vacated the stay of execution, concluding that, absent an accompanying constitutional violation, Herrera's claim of actual innocence was not cognizable on federal habeas review.

The Supreme Court affirmed the court of appeals. The Court reviewed its habeas jurisprudence and noted that, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id*. The Court reasoned that "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." *Id*. Accordingly, "a claim of actual

innocence is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id*. at 404.

Despite this discussion, the Court did not entirely foreclose the possibility that, in a capital case, a petitioner may be entitled to habeas relief on a showing of actual innocence, provided that the standard for proving such a claim was adequately high:

> We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were not state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

*Id*. at 417. Without enunciating a standard for an actual innocence claim, the Court determined that the affidavits in support of Herrera's petition were not sufficient to "trigger the sort of constitutional claim which we have assumed, *arguendo*, to exist." *Id*. at 418-19. Accordingly, at best, *Herrera* stands for the proposition that, *if* actual innocence merits federal habeas relief, a petitioner asserting such a claim must support it with evidence that satisfies an "extraordinarily high" standard. *Id*. at 417.

In his Sur-reply, Petitioner points to various citations from *Herrera* to support his claim that he is entitled to habeas relief on the basis of his actual innocence. However, the citations on which Petitioner relies appear in separate concurrences by Justice O'Connor (joined by Justice Kennedy) and Justice White, and in a dissent by Justice

12

Blackmun (joined by Justices Stevens and Souter). Justice O'Connor concurred in the judgment only, noting that, while "executing the innocent is inconsistent with the Constitution," Herrera was "not innocent, in any sense of the word." *Id*. at 419 (O'Connor, J., concurring). Similarly, Justice White "assume[d] that a persuasive showing of 'actual innocence' . . . would render unconstitutional the execution of the petitioner in this case," but agreed that Herrera's affidavits were not sufficient to establish his actual innocence. *Id*. at 429 (White, J., concurring). Finally, in his dissent, Justice Blackmun reasoned that the execution of an innocent person would violate the Eighth and Fourteenth Amendments, and, thus, the Court's prior habeas jurisprudence prevented federal courts neither from reviewing claims of actual innocence, nor granting habeas relief where the petitioner demonstrated that he was "probably innocent." *Id*. at 430-36 (Blackmun, J., dissenting). Although these opinions support Petitioner's position in this case, they do not represent the holding of *Herrera*. Further, to date, the Supreme Court has not decided whether a freestanding claim of actual innocence is sufficient to merit relief under § 2254. *See McQuiggin v. Perkins*, ___ U.S. ___, 133 S. Ct. 1924, 1931 (May 28, 2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.") (holding that actual innocence, if proved, excuses a petitioner's untimely filing of his habeas petition).

**B.     Actual Innocence and Return to State Court**

In it's Reply, the State contends that this Court should stay proceedings in this case and allow Petitioner to return to state court and exhaust his claim that he is

actually innocent. The State characterizes Sharp's trial testimony as strongly suggestive of Petitioner's guilt, as she testified specifically regarding: (1) the two large trash bags that Petitioner brought to her home that were eventually removed by Goldy; (2) Petitioner's instruction that she tell police she had picked him up at Pierce's home on the night of the murders; (3) her discovery of the bloody sock in Petitioner's washing machine and his mother's subsequent destruction of the sock; and (4) Petitioner's threat that he was going to kill her to prevent her from testifying against him. According to the State, absent Sharp's trial testimony – which she recants in her affidavit – Petitioner's conviction is placed "in some doubt," and, thus, Petitioner should be permitted to return to state court to present his actual innocence claim to the state courts. Petitioner concurs.

The State further supports its argument by contending that Petitioner's actual innocence may excuse the procedural default of several of his habeas claims.[1] This Court is skeptical that Petitioner's claim of actual innocence in this case is sufficient to

---

[1] A review of the record in this matter reveals that at least three of Petitioner's claims – those based on the State's decision to certify its witnesses and the sufficiency of the evidence – are unexhausted and procedurally defaulted. Petitioner did not assert these arguments in the memorandum in support of jurisdiction he submitted to the Ohio Supreme Court in support of his direct appeal. (Doc. No. 6-38.) Under Ohio law, *res judicata* now prohibits him from raising these issue in any post-conviction proceeding. See *State v. Cole,* 443 N.E.2d 169, 171, 2 Ohio St.3d 112, 113 (Ohio 1982); *State v. Perry,* 226 N.E.2d 104, 10 Ohio St.2d 175 (Ohio 1967) (holding that *res judicata* bars a criminal defendant from raising in post-conviction proceedings those claims that could have been raised on direct appeal). Thus, there are no longer any state court remedies still available to Petitioner with respect to these claims, and this Court may deems the claim procedurally defaulted. See *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' *Engle v. Isaac,* 456 U.S. 107, 125, n.28 (1982), it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law,' *Castille*[, 489 U.S. at 351].").

excuse procedural default, particularly given the extraordinarily high standard required by the Supreme Court, a standard the State does not address in its Reply. *See, e.g., House v. Bell*, 547 U.S. 518, 536-37 (2006) ("'[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'") (quoting *Schlup v. Delo*, 513 U.S.293, 327 (1995)).[2]

    The parties, however, agree that Petitioner should be permitted to return to state court to raise his actual innocence – and the underlying evidence to support that claim – in state court. Further, even despite this Court's reservations regarding the likelihood of Petitioner's success on this issue, allowing Petitioner to do so contributes to the efficient resolution of this habeas petition. Because several of Petitioner's claims are likely procedurally defaulted, this Court will be required to consider Petitioner's claim of actual innocence in deciding whether the procedural default is excused. Obviously, if the state court determines that Petitioner is entitled to a new a trial on the basis of his new evidence, this habeas petition will be moot. Further, if the state court denies a motion for a new trial, this Court will have the benefit of the state court's analysis of the issue of actual innocence to aid in the Court's determination of whether any procedural default is excused. Accordingly, allowing Petitioner to return to state court promotes judicial economy and efficiency, and provides deference to the state court.

---

[2] Here, even absent Sharp's testimony, the State's evidence included the testimony of other individuals who either placed Petitioner near the scene of the murders shortly after they occurred, or to whom Petitioner made inculpatory statements about the murders. Accordingly, even if Sharp's recantation of her testimony places Petitioner's conviction in "some doubt," it is doubtful that the absence of her testimony would more likely than not have resulted in acquittal in this case.

This Court should not, however, hold these proceedings in abeyance, as requested by the State. Rather, the appropriate procedural mechanism in this case is the dismiss and toll procedure described in *Moon v. Robinson*, No. 1:12-CV-1396, 2013 WL 3991886 (N.D. Ohio Aug. 2, 2013) (Helmick, J.). In that case, the Court dismissed the petition in order to allow the petitioner to return to state court and exhaust his state court remedies, and prospectively equitably tolled the AEDPA statute of limitations while the petitioner did so. *Id*. at * 8. In recognition of the State's "competing interest in finality," the Court conditioned the equitable tolling on the petitioner promptly pursuing his state court remedies and then, after exhausting his state court remedies, promptly returning to federal court. *Id*. ("Moon shall resume his pursuit of state court remedies within 30 days of my order and then he must return to federal court within 30 days of exhausting his state remedies. If Moon fails to abide by these guidelines, he shall not be entitled to equitable tolling under this order and any prospective tolling of the statute of limitations will be rescinded."). In this case, dismissing the petition without prejudice to refiling under the same conditions set forth in *Moon*, and equitably tolling the one-year period of limitations, affords Petitioner the opportunity to argue his claim of actual innocence in the forum best suited to consider it – the state courts – without risking inconsistent judgments on this issue. Conditioning the prospective tolling of Petitioner's statute of limitations on Petitioner promptly exhausting his state court remedies and then promptly returning to federal court addresses the State's interest in the finality of Petitioner's conviction.

## VI. Conclusion

For the reasons given above, it is recommended that this Court: (1) dismiss the habeas petition without prejudice to refiling; (2) order Petitioner to exhaust his state court remedies with respect to the new evidence he asserts in support of his claim of actual innocence; and (3) condition the prospective equitable tolling of Petitioner's statute of limitations on his prompt return to state court and, thereafter, his prompt return to federal court, as described in *Moon*.

Date: December 17, 2013                     /s/ *Nancy A. Vecchiarelli*
                                            United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**